435 So.2d 540 (1983)
Victor GOULD
v.
STATE of Louisiana, Through the LOUISIANA DEPARTMENT OF CORRECTIONS.
No. 82 CA 0899.
Court of Appeal of Louisiana, First Circuit.
June 28, 1983.
*541 Gregory F. Gambel, New Orleans, for plaintiff-appellant, Victor Gould.
Joseph Erwin Kopsa, Louisiana Dept. of Justice, Baton Rouge, for defendant-appellee, State of La., Through the Louisiana Dept. of Corrections.
Before COVINGTON, LANIER and ALFORD, JJ.
LANIER, Judge.
This is a suit for damages in tort. The petitioner, Victor Gould, an inmate at the Louisiana State Penitentiary in Angola, sued the State of Louisiana, through the Louisiana Department of Corrections (State), to recover the sum of $750,000.00 for personal injuries suffered on September 17, 1976, when he sustained a severe laceration of his left hand from being struck with a cane knife, or machete, which was being used by a fellow inmate while they were cutting grass at the state prison. Gould alleged the negligence of the defendant in failing to properly supervise the work detail of which he was a member, in failing to provide safe and proper equipment to work with, in failing to provide adequate training for the particular work and in ordering inmates under threats of physical harm to work in dangerous proximity to each other.
The State responded to the suit, generally denying the allegations of negligence and also asserting affirmative defenses of contributory negligence, assumption of risk and last clear chance.
Subsequently, the petitioner took the depositions of three correctional officers, Warren Gregory Foster, N.W. Davis and L.B. Johnston, Jr., and of eight fellow inmates, Lazarus Smith, George Carter, Matthew Joseph, William Dean, Tommy Atwood, Victor Brumfield, Calvin Blackburn and Willy Green. The defendant took the deposition of the petitioner, Victor Gould.
*542 The district court designated a commissioner to hear the proceedings and to report his findings and recommendations.
At the hearing before the commissioner only the petitioner testified, and the twelve depositions and the medical records of Gould were introduced in evidence. The hearing was held open so that the deposition of Dr. John Watermeier, the examining orthopedist, could later be put in evidence. When this was accomplished, the commissioner submitted his report and recommendations to the trial judge. The commissioner found that the inmates were working too close to each other; that the work detail had not received proper training in the use of the cane knives; that the defendant failed to provide adequate supervision over the work detail; that one of the correctional officers fired his gun as a threat to make the inmates work closer together; and that the work detail was sent to cut grass without being furnished gloves. Basically, the commissioner found that the State had breached its duty to provide a safe place to work and to provide proper supervision, and he recommended an award of $85,000.00 as damages.
The defendant opposed the commissioner's report, and the petitioner responded to the opposition. This led to a conference with the trial judge, in which both parties agreed that no further evidence would be presented to the court. The matter was then submitted to the trial court for decision.
The trial judge, upon a de novo review of the evidence, found that the petitioner had failed to prove by a preponderance of the evidence that defendant was negligent or that any alleged negligence of defendant caused injury to petitioner. Judgment was rendered in favor of the defendant. Petitioner's motion for a new trial was denied and this devolutive appeal followed.

FACTS
On the morning of September 17, 1976, Victor Gould was one of a group of new inmates cutting tall grass on the Louisiana State Penitentiary grounds. They were working in a formation, which was referred to as a "shoestring" formation, where one inmate would cut the grass close to the ground, making a path and then, after a pause, the next man in line would cut his path. To cut the grass the inmates were using cane knives, or machetes, which had sharp blades almost two feet in length.
Gould and the other inmates had not progressed very far with the grass-cutting when the inmate in front and to the right of Gould brought his knife down in such a motion and manner that he accidentally struck Gould's left hand causing a laceration of the fingers and hand. The injury was severe and painful and required hospitalization. According to Dr. John Watermeier, the examining orthopedist, Gould has a residual disability of 25% to the injured hand as a whole.

EFFECT OF COMMISSIONER'S REPORT
The instant case was heard initially by a district court commissioner pursuant to La. R.S. 13:713. It is the function of the commissioner to hold an evidentiary hearing and to submit to his district judge "proposed findings of fact and recommendations for disposition" of the matter he has heard. After the commissioner conducts a hearing, as was done in the instant case, and submits proposed findings and recommendations for disposition, it is the fundamental responsibility of the district judge to make the final determination of all issues involved and to decide the case by rendering judgment. The district judge accomplishes his responsibility by making a de novo determination of disputed findings and recommendations; he does not merely "rubber-stamp" the report of the commissioner. The district judge may accept, reject or modify the commissioner's findings and/or recommendations, or require additional evidence, or recommit to the commissioner with instructions. All of the adjudicatory power remains in the judge. The commissioner is a hearing officer without adjudicatory authority who, after a hearing, reports his factual findings with recommendations to the district judge, *543 who then makes the final determination and the adjudication. Bordelon v. Louisiana Department of Corrections, 398 So.2d 1103 (La.1981).
In Bordelon, the court stated:
The fundamental responsibility of the judge to make the final determination, after the commissioner conducts a hearing and submits proposed findings and recommendations, is insured by the requirement of a de novo determination of disputed findings or recommendations. Id. at 1105.
In the case at bar, the trial judge, as shown by his "Written Reasons for Judgment" (which are attached as "Appendix A"), fully effectuated the "commissioner-hearings" legislation, La.R.S. 13:711 et seq. He made a "de novo determination" of disputed points and retained "the responsibility for making" and did make the ultimate decision in the case. There is no basis for the appellant's argument that the trial court erred in not accepting the recommendation of the commissioner.

STANDARD OF REVIEW
In the instant case, only Gould gave live testimony at the hearing held before the commissioner. All of the other testimony, that of three correctional officers at the State Penitentiary and of eight inmates at the State Penitentiary, was presented in the form of depositions. The deposition of the plaintiff was also introduced in evidence, along with the plaintiff's medical records and the deposition of the examining physician.
The trial court, by agreement of the parties, decided the case based on the record which was made up of the evidence presented at the commissioner's hearing. No new evidence was presented by either side. In view of the state of the record, this court is in as good a position as the trial court to evaluate the credibility of the witnesses and resolve conflicts in the testimony of the witnesses. F & S Offshore, Inc. v. Service Machine & Shipbuilding Corporation, 430 So.2d 1167 (La.App. 1st Cir.1983).
In this state, appellate review in civil cases extends constitutionally to both law and facts. La. Const. of 1974, art. V, § 10(B). As to law, this court has full intermediate appellate review. As to facts, Canter v. Koehring Company, 283 So.2d 716 (La.1973), as refined by Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), delineates our review of facts as first an ascertainment that there is in the record "a reasonable factual basis" for the trial court's factual findings and second a determination from the record that the trial court's factual findings are not "clearly wrong." Then, if we, as an intermediate appellate court, find a reasonable basis for the factual findings and such findings are not clearly wrong (or manifestly erroneous), we are admonished not to disturb such findings of fact.
The basis for the Canter-Arceneaux rule is that the trier of fact, actually hearing and observing the witnesses give live testimony, is in a better position to evaluate credibility than a reviewing court on the intermediate appellate level, which at best can only study the written words of a cold record. Stated another way, according to Canter-Arceneaux, where there is a credibility issue or conflict in the testimony and the trial judge (trier of fact) has had the opportunity to observe the demeanor of the witnesses as they testify and to listen to the nuances of their oral testimony, great weight must be given to the factual conclusions of the trier of fact and they should not be disturbed unless clearly wrong.
In the instant case, the record is made up entirely of depositions and a transcript taken out of the presence of the trial judge. Where, as here, the trial judge relies on the depositions of the witnesses and/or a transcript, the Canter-Arceneaux rule does not apply, because the trial judge is in no better position to evaluate credibility or resolve conflicts in testimony than the reviewing court. Schwarz v. Bourgeois, 422 So.2d 1176 (La.App. 4th Cir.1982), writs denied 429 So.2d 153 (La.1983); Farris v. Ducote, 293 So.2d 589 (La.App. 3rd Cir.1974), writ refused 295 So.2d 814 (La.1974); Abu *544 Ali v. Guillory, 271 So.2d 882 (La.App. 4th Cir.1973). When evaluating depositions, rather than live testimony, we must determine, as a fundamental function of a reviewing court, the sufficiency and preponderance of the evidence. Blue Streak Enterprises v. Cherrie, 263 So.2d 734 (La.App. 4th Cir.1972).

THE EVIDENCE
VICTOR GOULD: He testified in his deposition that the workers were spaced about five feet apart at the start of the grass-cutting operation, but because there were so many inmates in the small area in which they were cutting, shortly after beginning their work they were from a foot and a half (18 inches) to two feet apart. About an hour after the grass-cutting began, the inmate in front of him and to his right (described as a young, black male) accidentally struck Gould on the boot with his cane knife. Gould said that he then "backed up" and told the inmate to "lighten up." Then, Foster (the guard) yelled and ordered him to get back in line. It was Gould's testimony that in a minute or two he was cut on the left hand by the knife of the same man who had struck his boot. Thereupon, Gould reported that he had accidentally been cut and he was taken to the hospital.
In his live testimony, Gould added that Foster had fired a gunshot prior to ordering him to get back in line. He repeated that the inmates were working in close proximity and that his boot was struck by the other inmate. His description of the accident was as follows:
Q. Mr. Gould, was this the first time that you were struck with that knife or by that individual on this day?
A. I had been hit on the foot by his knife.
Q. Were you cut?
A. No, it hit on my boot. It did not cut me.
Q. How longhow much time elapsed between the time he struck your boot and the time that he struck your hand?
A. Just a short period of time.
Q. Ten seconds, a minute.
A. No, because when he hit my boot and I knew it was hazardous for me to remain in that position. I stood up and tried to back away... And at that time, the free man told me to get back in the line or my head would be blown off.
Q. Do you recall what the free man said? ...
A. I didn't turn around. I assume that he was talking to me. I believe it was Mr. Foster...
Q. But you don't know which guard it was?
A. No, I didn't turn around.
Q.... What did you do immediately after ... the free man told you to get back to work?
A. I went right back in the line and the first cut that I made, my hand was cut.
TOMMY ATWOOD: He testified that he was about four men down the line from Gould. He said the men were placed about an arm's distance apart, not counting the swing blade (or about five feet apart) on each side. He did not remember hearing any gunshots on the day of the accident. He was never threatened by any guard. He did not actually see Gould get cut.
WILLY GREEN: He was sharpening the cane knives on the day of the accident. He was about ten to fifteen feet from Gould when he was injured. He estimated that the inmates were about two and a half feet apart in a line while cutting the grass. He told of seeing other minor cuts from knives during grass-cutting. He indicated that the area was small and that they were told to close in. He said, "Personally, they was too close, because they had a small area to cut." Green, in response to a question about who placed the inmates, said:
Well, they just tell them to catch in, but at that particular deal, Foster, he was clowning. He's kind of young, he likes to *545 play. He was shooting guns one time, talking to some of the inmates.
Green's testimony concerning the events is vague and confusing. Although he was only a short distance from Gould, he relates nothing about how the accident happened. He does not even say that he actually witnessed the incident. It is not clear on what occasion Foster fired a gun. Also, he said that on that particular deal Foster was "clowning." There is no suggestion of any threats made by any other inmate.
VICTOR BRUMFIELD: Brumfield testified he was working about six men down from Gould. The men worked about two feet from each other. He stated they were working in the evening on the day Gould was cut. He said they were lined up by Foster. He said that Gould was cut by a white man. He said that Foster never shot at him while he was in line but that Foster threatened him with a pistol. There was some reference to Foster shooting at a snake on one occasion (not the day of the accident).
Brumfield explained how Gould got cut as follows:
The man [said to be a white man but otherwise not described] was swinging and hit him somewhere on his hand, I believeon his arm. And he grabbed it, you know. Dudes, you know, who was workingthey saw him and they were trying tolike the other men on theup here they call it the head line. There was other men up here, and they was something like set us in, you know, to work. They was up here towhen they seen him get cut, well they come down to see what had happened.
No further questions were asked of Brumfield about how Gould got cut and the testimony went off on another point as to whether or not Brumfield or anyone else had been cut with a cane knife and if they had on gloves. A negative response was given to each question.
CALVIN BLACKBURN: He said he was immediately to Gould's left, on the end of the line and the unknown inmate who cut Gould was immediately to Gould's right. They were about two and one-half feet apart, side by side and they were lined up by Foster or by one of the inmates. He described the unknown inmate as brown-skinned, about five feet tall and weighing about 150 pounds. He maintained that Foster had a "habit of playing with the gun, shooting at things." Blackburn, who was next to Gould, said that Gould was cut by the man on his right. "Swinging that littleside of him, whenI was on the side of him when he got cut." He said that Gould got cut on his good hand, the one he was using to hold the knife, and that on the day in question, Foster was "hollering a lot of noise, hollering, playing with his pistol." Blackburn did not testify to any shooting on the day of Gould's injury. He indicated that he had learned how to cut grass with a cane knife "from the oldtimers. They had told me. Someone tells you."
GEORGE CARTER: In his deposition, Carter claimed to have placed the inmates in a line about five feet apart. (The placing of the men was done by the foreman, Davis.) There is no indication that he actually witnessed the accident of Gould. He said he had never been threatened by the guards. He made some vague reference to some shooting of weapons. He merely complained that cane knives were not the proper tool to use to cut grass. He said: "All I know was his hand was cut."
WILLIAM DEAN: He did not actually see the accident. He described how the men were set in a "shoestring", with one man following another. He said the men were spread about a foot apart; that the inmate who struck Gould was a foot to the front of him. He saw Foster shoot his .30-.30 rifle that day, but on the opposite side of the field, not at anybody. He also told of Foster having on another occasion shot at the horse boy "in an amusement manner." He knows of no threats made by Foster and considered Foster "a big comedian." He knew of no other persons getting struck by a cane knife while he was at Angola.
*546 LAZARUS SMITH: The inmate who cut Gould was a young black man about five feet four inches in height. He was third or fourth in line and Gould was about the sixth man in line to the right of Smith. The man who cut Gould was right next to Smith. There were about 30-40 men cutting in a curved line. They had just started to work when the accident happened. He stated that one of the guards, Davis, placed them in line. They were placed far enough to swing a blade. He said Foster was shooting that day but not in the line. He told of Foster playing with the horse boy "like he was going to shoot his hat off his head" on some other occasion. Foster also fired at a snake on one occasion. Those were the only times Smith remembered Foster shooting his gun. The weapon Foster used was a .38 caliber pistol. Smith did not consider cane knives appropriate for cutting grass in fields because they easily slip from your hand when swinging them. The accident was not caused by a cane knife slipping out of the hand of the inmate.
MATTHEW JOSEPH: He said the accident occurred after lunch (when it happened during the morning hours not long after they started to work). Joseph was about two men behind Gould when he was cut. As to the actual cutting, Joseph said: "I really didn't know he was cut. I seen the dude swing, and after that, I didn't know he was cut until he came up and say his hand was cut..." Joseph stated he was "a distance" from the man working next to him. Joseph's statement that the unnamed inmate had moved from group to group is contrary to all other statements. His statement that another inmate was cut at the same time as Gould differs from the stories of the other inmates. Joseph told of the cutting: "I was about two men behind him. Mr. Gould was about right here. I was about maybe three or four feet behind Gould. I was about three or four feet behind him. The dude was swinging, you know, he was swinging. Mr. Gould was in front of Mr. Foster. Mr. Foster told the dude to get in behind him, told the dude to get in behind Gould, to jump in right behind him. After Mr. Gould left, the dude took a swing and the dude jumped in right behind him. He was trying to keep the man from messing with him. He was swinging all wild and he wound up cutting Mr. Gould. He took my handkerchief and tied it around his hand."
This version places the man who cut Gould behind rather than in front of Gould and says that Foster was right on the scene at the time of the incident. There is no other evidence that the "unknown man" and Foster were "messing" around or that there was an altercation between them.
N.W. DAVIS: He was a line foreman for the State Penitentiary at the time of the accident. As such, he had the responsibility of supervising a group or a line of inmates and was the boss over two or three guards. He was classified as a Correctional Officer II. He explained that he actually went into the field with the inmates and did the placing or setting of the inmates for work at the particular job. He said he had about 50 inmates in his line the day Gould was cut. He set the men ten to twelve feet behind each other in rows of about a foot and a half apart in order to "shoestring it." He had two guards at the time, one at the fence watching down the fence and the other at the corner of the men. Foster was on the back corner and L.B. Johnston was stationed on the front.
Davis became aware of what had happened when Gould grabbed his hand and hollered. He did not see what happened but went to Gould when Gould hollered. He determined that Gould had been cut across the knuckles with a cane knife. Davis sent the horse boy for assistance and they carried Gould to the hospital.
He testified that Foster did not fire any shots on the day in question and that the inmates had not complained to him of Foster shooting his gun.
Davis explained in detail the placement of the inmates, the type of field in which they were cutting the grass and why cane knives were used for this type of job. He *547 was conversant with this type of work and explained the safety precautions they took.
L.B. JOHNSTON: Mr. Johnston was a guard with the Department of Corrections with the rank of sergeant. He was positioned about 75 feet from the line so he did not see Gould get cut. He stated: "I recall the man getting hurt, I didn't see it when it happened. I was out away from the line." He gave the distance (front to rear) between the men as ten or eleven feet, and they were started in a straight line. Each man cut the strip or path in front of him, about five feet on each side. Johnston stated that Foster did not fire his weapon during the course of that morning. He said he would have known if Foster had shot his gun. He further said he had never witnessed Foster shooting at an inmate. He said about the accident: "I believe he (Gould) was cut by another inmate, the way I heard it. I didn't see it the way it happened, but the way I understood it was that he was cut by another inmate." He stated that the foreman, Davis, went out among the workers.
WARREN GREGORY FOSTER: Foster, as Correctional Officer II, had the duty to work inmates. He did not witness the accident. He stated that Davis set the men out at about eight to ten feet apart, shoestringing them. No other inmates were struck with a knife that morning. He denied threatening inmates. He stated that was the only time he had known of an inmate cut with a cane knife.
His testimony concerning the incident was:
"No, sir. I didn't really see it happen. I know I seen it whenever he (Gould) went up in there to cut grass. That's the only thing I seen whenever he went to cut grass. And I heard him whenever he hollered, and I looked and that is when he pulled his hand back and come to see me and Mr. Davis and told us he had been cut."
He said Gould was cut across the knuckles of the fingers of the left hand (his good hand). Foster denied threatening Gould or shouting to him prior to the accident. Additionally, he testified that he did not shoot his weapon on the day of the accident.
None of Gould's fellow inmates or Gould knew the name of the person who cut Gould. Most agree that he was a young, black male, although one said it was a white male. The descriptions varied and were not sufficient for any identification purposes. No effort was made by any party to find out the name of the "unknown black male" and take his testimony.

PROPER SUPERVISION
The petitioner claims that the State was negligent in failing to provide proper supervision of the work detail. The evidence shows that three guards were overseeing this work detail. They were adequate under the circumstances. It would be unreasonable to expect that a closer supervision over this type of work could have been maintained. It is doubtful that the closest type of one on one supervision could have prevented the present accident. It happened as quickly as a flick of the wrist. Under the circumstances, we do not find that the State breached the duty to provide proper supervision.

SAFE AND PROPER EQUIPMENT
The Department of Corrections owes prison inmates the duty of providing equipment which is safe for whatever tasks inmates may be required to perform. Bridgewater v. State, Department of Corrections, 422 So.2d 1214 (La.App. 1st Cir. 1982), writ granted 426 So.2d 175 (La.1983). This does not, however, mean that the occurrence of an accident in a penal institution shifts the burden of proof to the institution merely because the institution furnishes the equipment for a particular task. See Reed v. State, Department of Corrections, 351 So.2d 788 (La.App. 1st Cir.1977); Boyd v. Department of Corrections, 292 So.2d 793 (La.App. 1st Cir.1974).
The only equipment provided for this work detail was a cane knife, or machete. Such equipment is a proper tool for cutting grass on the type of terrain involved *548 in the instant case. The foreman Davis, who was experienced in this type of work, testified that a cane knife was a proper tool for the work under the circumstances involved. Mowing equipment could not be used on the rough terrain or the area involved. The grass had to be cut by hand and it was not unreasonable for the State to have it cut by inmates using cane knives.
The inmates were provided with boots or brogans to protect their feet. The fact that the men were not provided with gloves is of no significance in this case. The knife did not slip out of the inmate's hand, and there is no evidence to indicate that gloves would have provided any significant measure of protection from the sharp machetes.
There is no merit in the petitioner's contention that it was inherently unsafe to use machetes to cut tall grass. The record shows that this was the manner in which grass on uneven terrain was cut at Angola over a long period of time without undue risk to life and limb. The accident in question was not caused just because machetes were used. Gould was injured because he got too close to another inmate who was swinging a machete. He placed himself in close proximity to the unknown inmate even though moments before he had been struck on the boot by this individual's machete and even though, by his own admission, he knew it was "hazardous" for him to be that close to that inmate.

THREATS BY FORCE
The appellant contends that he got so close to the individual who cut him because one of the guards, Foster, had threatened to kill him if he did not do so and had actually shot in Gould's direction.
From our reading of the depositions, we find that not one of the other inmates supports Gould's testimony that Foster shouted at Gould. The inmates' testimony concerning the shooting of weapons is confused and confusing, to say the least. Some inmates said Foster shot his gun on September 17, 1976. Others stated they did not know whether he had fired his weapon. The other security guards, Davis and Johnston, testified that Foster did not fire his gun on the day in question. Foster denied shooting his weapon.
The evidence shows that neither Foster nor any of the guards fired any shots just prior to the accident or on the day of the accident. There are some irrelevant references to Foster shooting at a snake and at the hat of Willie the "horse boy" on other occasions (whether with a pistol or rifle is not clear). There is nothing to indicate that there was any shooting to threaten or intimidate the inmates back into line. It was not established by the evidence that Foster fired a shot just prior to the accident as claimed by Gould. Many of the inmates recited a "similar" story about the "hat shooting" incident with Willie the "horse boy", but few, if any, of them actually witnessed the supposed incident.
Verbal threats by Foster were not adequately proven. The guard Foster, who supposedly made the threats, was variously characterized as "playful" and a "comedian", and the inmates nearest to Gould heard no threats.
The record supports the conclusion that the petitioner failed to prove by a preponderance of the evidence that Foster fired his gun on this occasion or threatened Gould in any manner to make him work in dangerous proximity to his fellow inmates. Russell v. Amiss, 386 So.2d 656 (La.App. 1st Cir.1980). Although another inmate, Matthew Joseph, stated that Foster shot his gun several times (not just once) on the day of the accident, Tommy Atwood, an inmate working about four men down the line from Gould did not recall any gunshots on the day in question. In fact, Gould, throughout his deposition testimony, never mentioned that a gun was fired. It was only in his live testimony before the commissioner, given several years after the accident, that Gould "recalled" that Foster had fired a gun. Since Gould did not turn around, he obviously did not see Foster shoot a gun. His testimony on this point is not persuasive.

*549 DANGEROUS PROXIMITY
We find it unlikely that the inmates were spaced in such close proximity as some of the inmates stated. Inmate Smith said they were placed far enough apart to swing the knife. Matthew Joseph indicated that there was "a distance" between the workers. The foreman, N.W. Davis, placed the inmates ten to twelve feet apart in rows of about a foot and a half apart in order to "shoestring" them. They were not placed too closely together. Davis explained at considerable length the placement of the workers in the field and how the cutting was performed. His testimony was corroborated by L.B. Johnston. Foster stated Davis placed the men about ten feet apart, "shoestringing them."

SPECIAL TRAINING
Gould contends that the State was negligent by failing to provide adequate training on the use of a cane knife. The opinion of the trial judge (attached as Appendix A) correctly disposes of this issue.[1]

CONCLUSION
Our careful review of the evidence, in light of the applicable law, convinces us that the petitioner has failed to prove by a preponderance of the evidence that the defendant was negligent or breached a duty owed to him under the circumstances of this case.
For the foregoing reasons, the judgment of the trial court is correct and is affirmed. The appellant is cast for all costs of this appeal.
AFFIRMED.
 APPENDIX A
 NO. 200,017 : DIVISION "B"
 VICTOR GOULD : 19TH JUDICIAL DISTRICT COURT
 VS. : PARISH OF EAST BATON ROUGE
 STATE OF LOUISIANA : JUDGE FRANK FOIL

WRITTEN REASONS FOR JUDGMENT
On September 17, 1976, Victor Gould, an inmate, was accidentally injured by another inmate while cutting grass at Angola State Penitentiary. Mr. Gould was one of 15 to 20 inmates who were using a machete to cut grass in an A.U. line. The inmates were working in a shoestring formation which consisted of a line in the shape of a horseshoe. One man would begin to cut his row, then after a pause, the next man would move forward, cutting his own path. Mr. Gould was not very far along when the inmate in front and to the right of him accidentally struck Mr. Gould on the left hand. Mr. Gould filed suit against the State of Louisiana through the Department of Corrections for damages arising out of this accident, alleging that the state was negligent in:
1. Failing to properly supervise the work detail.
2. Ordering the inmates, under threat of physical harm to work at close intervals.
3. Failing to provide safety equipment.
4. Failing to provide adequate training in the assigned tasks.
On June 5, 1980, this matter was submitted to the Commissioner for the 19th Judicial District Court. All of the witnesses and most of the plaintiff's testimony was submitted to the commissioner by deposition. On February 5, 1982, the commissioner rendered his report recommending a verdict in favor of plaintiff in the amount of $85,000.00.
On February 17, 1982, the state filed a request for an extension of 20 days within which to file a traversal. This Court granted *550 the motion and gave the state 20 days from February 23, 1982, to file the traversal. The traversal was later filed.
Procedural Problem
The commissioner notified all parties that they must submit objections to his recommendations by February 15, 1982. However, the state did not act upon this matter until February 17, 1982.
Plaintiff takes the position that since the state did not object to the commissioner's rule timely, then the commissioner's recommendation is final and the matter is completed.
The Court does not agree with plaintiff.
R.S. 13:711 created the offices of two Commissioners of the 19th Judicial District Court. Under that law, the commissioners may perform duties assigned to them by the district judges. However, they do not have adjudicatory powers. (See R.S. 13:713(B).
Further, R.S. 13:713(C) provides as follows:
"In furtherance of the above, a commissioner may be designated and assigned to hear and determine any pretrial matter pending before the court, except motions for injunctive relief and temporary restraining orders in civil matters and preliminary hearings, motions for discovery, motions to suppress, and motions to quash in criminal matters, or any motion or exception which adjudicates any question of law or fact with regard to that matter. A commissioner may be designated to conduct hearings, including evidentiary hearings, and to submit to the judge of the appropriate division, proposed findings in fact and recommendations for the disposition thereof of any matter or motion pending before the court, or any application for post trial relief made therein. In such cases, the commissioner shall file his proposed findings and recommendations with the court, and a copy shall forthwith be mailed, postage prepaid, to all parties or their counsel of record. Any party, within ten days after transmittal of such copy, may traverse such findings or recommendations in writing in such manner as shall be specified by the rules of the district court. The judge of the appropriate division shall make a de novo determination of any findings or recommendations to which objection is made. The judge may accept, reject, or modify in whole or in part the findings or recommendations made by the commissioner and also may receive further evidence or recommit the matter to the commissioner with instructions."
This means that the commissioners are authorized to conduct hearings and submit proposed findings of fact and recommendations to a judge. If any of the parties timely object to the commissioner's report, then, under the above law, the judge is required to make a de novo determination of the matter. The law further states that the "judge may accept, reject or modify in whole or in part the findings or recommendations made by the commissioner and also may receive further evidence or recommit the matter to the commissioner with instructions." The Court feels that this latter requirement must be carried out whether a party objects to a recommendation of the commissioner or not. This is because the commissioners do not have adjudicatory powers. The judge must retain the responsibility for making ultimate decisions in the case. (See Bordelon v. Louisiana Dept. of Corrections, 398 So.2d 1103.
Liability
After the commissioner's findings, the Court held a conference with attorneys of the parties. Both attorneys agreed that no further evidence was to be submitted, and agreed for the Court to decide the case based on the record already compiled in the case.
It is undisputed that the state is not strictly liable for prisoners' injuries. The plaintiff must prove that the state was negligent and that this negligence was the cause of plaintiff's injuries.
The plaintiff's argument that the defendant was negligent in failing to provide adequate training is without merit. A machete is not a complex tool. "Special training" *551 cannot provide any added measure of safety in the use of this simple tool. Its dangers are self apparent.
The plaintiff's claim that the defendant failed to provide the proper safety equipment is similarly without merit. Here the plaintiff attempts to make much of the fact that the defendant did not provide the inmates on the A.U. line with gloves. However, there has been no evidence to indicate that gloves would have prevented plaintiff's injuries.
Actually, almost all of the testimony in this case concerned whether the defendant properly supervised the plaintiff's work detail and whether the defendant ordered the inmates under threats of physical harm to work unreasonably close to each other.
The evidence indicates that the work began satisfactorily. Mr. Foster, one of the guards on duty in the A.U. line, testified that the inmates were eight to ten feet apart when the cutting first began. Even the plaintiff testified that the inmates were started out in a staggered shoestring formation about five feet apart.
The dispute in this case concerns what happened next.
According to Mr. Gould, the guards, and particularly Mr. Foster, forced the inmates to work closer and closer together by firing a gun, and yelling "get back in lineI'll blow your head off." Another inmate, Matthew Joseph, testified that Mr. Foster fired his gun several times on the day of the accident.
Yet, Tommy Attwood, an inmate working only four men down from Mr. Gould couldn't remember a gun being fired at all on the day of the accident. In fact, Mr. Gould himself, throughout extensive examination in his deposition, never once mentioned that a gun had been fired. Only in Mr. Gould's testimony before the commissioner, given long after the accident and depositions, did Mr. Gould remember that Mr. Foster had fired the gun.
Matthew Joseph testified that a Mr. Max Zarder told Mr. Foster that they were being pushed in too close together. The Court however wonders why the plaintiff did not present Mr. Zarder's testimony on this point.
Almost every inmate recounted an identical story alleging that in the past Mr. Foster had shot the hat off of Willie the horseboy. However, many of these inmates do not even profess to have personally witnessed the horseboy incident. In addition, the plaintiff has not produced any testimony of Willie, victim of the alleged incident. The Court also takes note of the fact that, although these inmates remember identical stories of the prior horseboy incident, Victor Brumfield, working only five or six feet away from plaintiff at the time of the plaintiff's accident, testified that it was a white man that cut plaintiff when, in fact, it was a black man. Matthew Joseph testified that he was sure that the accident occurred after lunch when, in fact, it occurred in the morning, not long after the work started.
The evidence, taken as a whole, does not prove that the defendant ordered the inmates to work at close intervals under threat of physical harm. Nor does it prove that the defendant failed to properly supervise the work detail. Mr. Foster testified that he told the man who cut the plaintiff, "to slow that blade down, that he was swinging it too fast. He had both hands on it, swinging it like a wild man going down there."
It was a tragic accident and the Court is sympathetic to the serious nature of Mr. Gould's injuries. However, after considering all of the evidence, the Court finds that there is no factual basis to hold that the defendant was negligent.
Accordingly, judgment is rendered herein in favor of the defendant and against the plaintiff, dismissing plaintiff's suit.
Judgment will be signed accordingly.
Baton Rouge, Louisiana, June 10, 1982.
 /s/ Frank Foil
 DISTRICT JUDGE
NOTES
[1] N.W. Davis testified that he offered the "water boy" job to Gould but Gould indicated that he did not want pity, he had done time before and he would rather work the field just like he did before. Gould's testimony indicated that this was his third incarceration for a felony conviction.